UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| AMBER BROWN, | ) | CASE NO. 1:16CV2656 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |
| | ) | |


Plaintiff Amber Brown ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her application for Disability Insurance Benefits ("DIB").  ECF Dkt. #1.  In her brief on the merits, filed on March 9, 2017, Plaintiff asserts that the administrative law judge's ("ALJ") decision: (1) violates the treating physician rule; and (2) is not supported by substantial evidence.  ECF Dkt. #14.  Defendant filed a response brief on May 10, 2017.  ECF Dkt. #16.  Plaintiff did not file a reply brief.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

**I.**   **PROCEDURAL HISTORY**

On December 16, 2013, Plaintiff protectively filed an application for DIB.  ECF Dkt. #12 ("Tr.") at 28, 160-66.[2]  The application was denied initially and upon reconsideration.  *Id.*  Plaintiff then requested a hearing, which was held on August 5, 2015.  *Id.* at 46.  On August 27,

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed as a .PDF, rather that the page numbers assigned by the CM/ECF system.  When the Transcript was filed the .PDF included an index, with the indexed pages differentiated from the numerical pages.  Accordingly, the page number assigned in the .PDF mirrors the page printed on each page of the Transcript, rather than the page number assigned when the Transcript was filed in the CM/ECF system.

2015, the ALJ issued a decision denying Plaintiff's claim.  *Id.* at 25.  Subsequently, the Appeals Council denied Plaintiff's request for review.  *Id.* at 1.  Accordingly, the August 27, 2015, decision issued by the ALJ stands as the final decision.

Plaintiff filed the instant suit seeking review of the ALJ's August 27, 2015, decision on October 31, 2016.  ECF Dkt. #1.  On March 9, 2017, Plaintiff filed a brief on the merits.  ECF Dkt. #14.  Defendant filed a response brief on May 10, 2017.  ECF Dkt. #16.  Plaintiff did not file a reply brief.

## II.  RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.  Medical Evidence

In January 2013, Plaintiff sought psychiatric care at Neighborhood Family Practice.  Tr. at 358-59.  Plaintiff reported a history of depression.[3]  *Id.*  Over the course of approximately twenty primary care visits from January 2013 through July 2015*,* Plaintiff consistently displayed normal mood, affect, behavior, judgment, and thought content on examination.  *Id.* at 287, 293, 299, 312, 317, 324, 329, 336, 341, 348, 361, 489, 500, 792, 918, 923, 926, 981, 991, 1006.  Plaintiff underwent a mental health examination on February 11, 2013, during which it was noted that she was twenty-four years old and reported that the onset of her symptoms occurred two years prior.  *Id.* at 384.  At the examination, Plaintiff reported that she was the caretaker for her ailing parents, had a two-year old daughter, and that her husband was a heroin addict who was serving time in prison for involuntary manslaughter.  *Id.* at 385.  Regarding her work history, Plaintiff stated that she worked at Giant Eagle for six years, but was let go due to missing too much work once her parents became ill.  *Id.*  It was noted that the illnesses of her parents and relationship stress with her husband were contributing factors to Plaintiff's mental state.  *Id.*

On May 10, 2013, Richard Hill, M.D., stated that Plaintiff reported significant depression, but added that her medications had "worked wonders" and helped "even out" her

---

[3]Neither Plaintiff nor Defendant take issue with the ALJ's treatment of Plaintiff's alleged physical impairments, instead focusing on her mental impairments.  *See* ECF Dkt. #14 at 4-13; ECF Dkt. #16 at 2-13.

mood.  Tr. at 380.  Dr. Hill noted that Plaintiff stated that she was diagnosed as "schizoaffective with bipolar tendencies" in her early teenage years, and that she had experienced auditory and visual hallucinations in the past, but was not experiencing hallucinations at the time of the examination.  *Id.*  Dr. Hill further noted that Plaintiff: was morbidly obese; dressed in casual clothes that fit; had makeup that was applied carefully; spoke rapidly and in a pressured manner; had thoughts that were "a bit tangential at times," but most often circumstantial; responded well to refocusing; denied auditory and/or visual hallucinations; denied paranoia or suspiciousness; and conducted herself in a "somewhat 'overly familiar' manner."  *Id.* at 382.  Plaintiff was diagnosed with depression and vertigo, and Dr. Hill issued a rule-out diagnosis of schizoaffective disorder.  *Id.* at 382.

At a second appointment with Dr. Hill, on May 28, 2013, Plaintiff reported that she had not heard voices or experienced paranoia since high school, and that she had been doing "quite well" during her time working at Giant Eagle.  Tr. at 377.  Plaintiff  denied auditory or visual hallucinations.  *Id.*  Continuing, Plaintiff stated that she had an individualized education program in school because she "couldn't sit still and couldn't pay attention," but that she was never diagnosed with attention deficit hyperactivity disorder ("ADHD").  *Id.*  Dr. Hill assessed that bipolar disorder was unlikely and that it was "much more likely" that Plaintiff had ADHD, and prescribed medication accordingly.  *Id.* at 378.

In June 2013, Plaintiff told Dr. Hill that she: finished tasks before moving on to another; was better able to focus without being distracted by other things, citing a movie as an example; and felt a bit more calm and "less driven by a motor."  Tr. at 374.  Dr. Hill indicated that Plaintiff was casually dressed and groomed, and had her "younger daughter and cousin" with her for the appointment.  *Id.*  Plaintiff again denied auditory or visual hallucinations.  *Id.* at 375.  Continuing, Plaintiff stated that she slept four to five hours per night, her appetite was stable, and that she did not experience dangerous thoughts or intentions.  *Id.*  In August 2013, Plaintiff reported that her ability to focus had improved greatly, and that she was less "scattered" and more organized and calm.  *Id.* at 371.  Plaintiff also reported increased periods of insomnia and that she had been awake for seventy-two hours straight twice in the last month.  *Id.*  Dr. Hill

noted that Plaintiff: was neatly dressed and groomed, with her hair neatly styled; spoke at a normal rate/rhythm and at a normal volume; was not agitated or irritable; and denied psychosis, paranoia, and dangerous thoughts/intentions.  *Id.*  Additionally, Dr. Hill revised his assessment and plan to omit any indication of bipolar disorder, instead only listing depressive disorder.  *Id.*

On September 6, 2013, Dr. Hill indicated that Plaintiff reported increased rage and anger, and that she was lashing out at her parents and daughter.  Tr. at 368.  Dr. Hill reported that Plaintiff's mood and demeanor were "markedly different" from her previous appointment, and that she appeared to be "on edge."  *Id.*  On September 23, 2013, Plaintiff reported to a nurse practitioner that she had an argument with her father and was staying with a friend for the day.  *Id.* at 292.  In November 2013, Plaintiff reported that she was working on finding a job.  *Id.* at 510.

Plaintiff returned to Dr. Hill on December 11, 2013, and reported that she had been out of her ADHD medication for several weeks and was "fidgeting, moving all around, and talking fast," and that she was feeling "overwhelmed and then driving everyone at my house crazy because [she] became angry."  Tr. at 364.  Plaintiff stated that she "used to be a cutter."  *Id.*  Continuing, Plaintiff told Dr. Hill that she had recently seen bugs coming out of her couch and that she had not had any other visual hallucinations in the prior seven years.  *Id.*  Plaintiff indicated that she had tried to work many times, but that stress usually led to irritability and her termination.  *Id.* at 365.  Dr. Hill noted that Plaintiff: was dressed neatly; had very good hygiene and grooming, however, Dr. Hill also stated that her hygiene was poor and she was somewhat malodorous; was able to attend well and maintain eye contact; had logical and goal-oriented thoughts; appeared to be "on edge"; spoke loudly and with pressure; denied dangerous thoughts/intentions; and was sleeping very well with the addition of a new medication.  *Id.* at 365.  Additionally, Dr. Hill noted that Plaintiff wondered if she should pursue disability benefits.  *Id.*  Dr. Hill diagnosed Plaintiff with ADHD and insomnia.  *Id.*

Plaintiff completed a function report on December 28, 2013.  Tr. at 191.  In the report, Plaintiff indicated that she stayed at home with her two-year old daughter and that she helped care for her disabled parents.  *Id.* at 193.  Continuing, Plaintiff noted that she cleaned, drove her

-4-

parents to doctor's appointments, and shopped for food.  *Id.* at 193, 195.  Plaintiff stated that she prepared one meal a day and that she was able to keep up with the house work when she took her medications.  *Id.* at 196.  When asked if she had problems with family, friends, neighbors, or others, Plaintiff stated that she had problems with her sisters and parents due to anger and anxiety, and that she found it "hard to get along with anyone most of the time."  *Id.* at 197.  Plaintiff indicated that her hobbies and interests consisted of watching television, playing with her daughter, and playing games on the computer or television.  *Id.* at 198.

State agency psychological consultant, Cynthia Waggoner, Ph.D., evaluated Plaintiff's mental impairments on January 10, 2014.  Tr. at 80.  Dr. Waggoner found that Plaintiff medically  supported mental impairments of ADD/ADHD and affective disorder did not satisfy the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.02 and 12.04.  *Id.*  Continuing, Dr. Waggoner assessed that Plaintiff had: mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.  *Id.* at 83-85.  Dr. Waggoner found that Plaintiff was capable of: understanding and remembering simple one- to three-step instructions; sustaining concentration and persistence on simple one- to three-step tasks in a setting devoid of fast-paced demands; interacting superficially; and adapting to infrequent changes in a static work setting.  *Id.*  Further, Dr. Waggoner stated that Plaintiff had a history of hallucinations as a teenager, but had not experienced any episodes in several years, and reported that she had been able to sustain employment.  *Id.* at 85.  Dr. Waggoner also noted that Plaintiff helped her parents.  *Id.*  Carl Tishler, Ph.D., affirmed Dr. Waggoner's findings on reconsideration.  *Id.* at 94-95, 97-99.

In February 2014, Plaintiff reported increased anxiety and worsening depression, and that she did not think her medications were working any longer.  Tr. at 497.  Plaintiff was diagnosed with diabetes, neuropathy, and dermatitis.  *Id.* at 498.  In March 2014, Plaintiff visited Dr. Hill with her mother.  *Id.* at 492.  Dr. Hill indicated that Plaintiff's mother stated that her behavior had improved significantly since her teenage years, and that she had been diagnosed with schizoaffective disorder bipolar subtype and oppositional defiant disorder as a teenager.  *Id.*  Dr.

-5-

Hill noted that Plaintiff still appeared to be "on edge," but that she had vastly improved since her previous appointment. *Id.* Plaintiff denied dangerous thoughts/intentions, as well as any psychosis or paranoia. *Id.* The following day, Plaintiff reported to the Parma Community General Hospital complaining of a headache and anxiety. *Id.* at 610. Joseph Cooper, D.O., noted a flat affect and that he believed Plaintiff was baseline. *Id.* Dr. Cooper indicated that Plaintiff did not appear to be a threat to herself or others, and was not acting psychotic. *Id.* at 610-11. Plaintiff was diagnosed with a headache and anxiety/depression, and Dr. Cooper recommended a change to her medication before discharging her without further testing. *Id.* at 611.

Plaintiff reported hypertension, weight management problems, and depression in May 2014. Tr. at 790. In July 2014, Melanie Golembiewski, M.D., examined Plaintiff. Tr. at 929. Dr. Golembiewski stated the Plaintiff's back pain seemed to subside over the course of the visit and that the location of the pain was not consistent with Plaintiff's large ovarian cyst. *Id.* Continuing, Dr. Golembiewski indicated that she was "worried [Plaintiff] will seek ER services again, though they do not seem warranted at this time." *Id.*

Plaintiff returned to Dr. Hill in November 2014, and reported that she saw the "snow moving like sand, a car distorting itself back and forth, a 'monster like thing' that she saw under a blanket, and 'people' that she talked to on one occasion." Tr. at 1001. Additionally, Plaintiff told Dr. Hill that her ex-husband was released from prison and had been harassing her with phone calls. *Id.* Dr. Hill noted that Plaintiff: was neatly dressed and groomed; well nourished; and reported insomnia, decreased energy, tearfulness, and limited hallucinations. *Id.* After the examination, Dr. Hill diagnosed adjustment disorder with mixed emotional features and schizoaffective disorder bipolar subtype. *Id.* at 1002. Dr. Hill recommended psychotherapy, encouraged Plaintiff to become involved in an activity to improve her self-esteem, and adjusted her medications by reducing her antidepressant and eliminating her ADHD and sleep-aid medications. *Id.*

Three days later, on November 24, 2014, Plaintiff was admitted to Southwest General Hospital complaining of weakness, fatigue, and memory loss. Tr. at 942. Plaintiff was diagnosed

with anxiety and schizoaffective disorder, but was noted to be in stable condition.  *Id.* at 945.
After the diagnosis, Plaintiff was transferred to Oakview Behavioral Health Center.  *Id.* at 949.
Upon transfer, Plaintiff stated that she was not taking care of herself mentally or physically, and
that she had been experiencing psychotic episodes.  *Id.* at 494.  Plaintiff reported seeing "bugs
coming out of the couch" and people that did not exist.  *Id.*  As for stressors, Plaintiff cited her
mentally abusive ex-husband.  *Id.*  Plaintiff denied current visual hallucinations and other
psychiatric symptoms, and stated that she "really need[ed] outpatient help."  *Id.* at 956.  The
nurse practitioner examining Plaintiff stated that "[i]t is also important to note patient stated that
she recently filed for disability."  *Id.*  After the examination, Plaintiff was diagnosed with
schizoaffective disorder by history, ADHD by history, rule-out post-traumatic stress disorder,
rule-out "factitious disorder vs. malingering," traits or borderline personality disorder, and
assigned a global assessment of functioning ("GAF") score of thirty.  *Id.* at 962.  Plaintiff was
discharged on November 26, 2014, with the same diagnosis other than an increased GAF score
of forty-five to fifty and medication adjustments.  *Id.* at 970-71.

In December 2014, Plaintiff visited a licensed professional clinical counselor who noted
that Plaintiff: arrived on time; dressed appropriately for the weather; was well-groomed; had
normal thought process and content; was cordial and cooperative; displayed limited eye contact;
was somewhat anxious; had normal speech; and displayed logical and thoughtful judgment, good
insight, and the ability to verbalize feelings and thoughts.  Tr. at 999.  Plaintiff also reported that
she is responsible for keeping her house clean.  *Id.*  In January 2015, Plaintiff indicated that her
friend's family was staying with her and her parents while they saved money for their own place
to live.  *Id.* at 994.  Additionally, Plaintiff reported that she spent four days at her cousin's home
at the end of the year and that it was like a "little vacation."  *Id.* at 995.  Plaintiff also stated that
she changed her phone number so her ex-husband could not contact her and that she was
throwing away his possessions that were still in her home.  *Id.*  It was noted that Plaintiff
recognized that she had "a lot going on around her and has a lot she [could] get overwhelmed
with," and that she agreed with the recommendation that she focus on herself and her self-care.
*Id.*

In February 2015, Plaintiff visited Dr. Hill and reported that: she was seeing people and formed images prior to her admission to the hospital in November 2014; her ex-husband found a way to reach her despite the changed phone number; and she was feeling much better on her medication regimen.  Tr. at 987.  On examination, Plaintiff: appeared well nourished; was neatly dressed and groomed; had good hygiene; had dyed hair and carefully applied makeup; was somewhat "dressed up"; and somewhat historic/dramatic.  *Id.* at 987-88.  Dr. Hill noted that a fictitious/malingering diagnosis was entertained in the hospital, but that Plaintiff's borderline personality disorder, which was also noted, "may influence sense [Plaintiff] is malingering."  *Id.* at 988.  Additionally, Dr. Hill indicated that Plaintiff may have been "splitting" and remarked that her report that she became ill after a change in her medications may have actually had to do with her ex-husband being released from prison.  *Id.*  In March 2015, Dr. Hill indicated that Plaintiff reported increased anxiety and stress due to a possible pregnancy.  *Id.* at 985.  Dr. Hill explained to Plaintiff that given the complexity of her medical/psychiatric status and strong psychosocial component, he was no longer comfortable treating her if she did not make arrangements to get concurrent psychotherapy, as repeatedly recommended.  *Id.* at 985-86.  Plaintiff stated that transportation to the counseling session was an issue and she was offered bus tickets by Dr. Hill.  *Id.*  Plaintiff indicated that the bus tickets would help.  *Id.* at 986.

On April 8, 2016, Dr. Hill completed a check-the-box style Medical Source Statement regarding Plaintiff's mental capacity.  Tr. at 940-41.  Dr. Hill opined rated Plaintiff's capabilities to perform basic mental activities of work on a sustained basis as follows: frequently follow work rules; frequently use judgment; occasionally maintain attention and concentration for extended periods of two-hour segments; frequently respond appropriately to changes in the work setting; rarely maintain regular attendance and be punctual with customary tolerance; rarely deal with the public; rarely relate to co-workers; rarely interact with supervisors; occasionally function without redirection; occasionally working in coordination with or proximity to others without being distracted; occasionally working in coordination with or proximity to others without being distracting; rarely deal with work stress; rarely complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a

consistent pace without an unreasonable number of rest periods; occasionally understand, remember, and carry out complex job instructions; occasionally understand, remember, and carry out detailed, but not complex, job instructions; occasionally understand, remember, and carry out simple job instructions; frequently maintain appearance; frequently socialize; rarely behave in an emotionally stable manner; rarely relate predictably in social situations; occasionally manage funds and scheduling; and occasionally leave home on her own. *Id.* After completing the check-the-box portion of the form, Dr. Hill listed Plaintiff's diagnosis and symptoms that support the assessment as schizoaffective disorder, bipolar personality disorder, hallucinations, self injurious behavior, and chaotic relationships. *Id.* at 941.

### B. Testimonial Evidence

The ALJ held a hearing on August 5, 2017, with Plaintiff, her attorney, and a vocational expert ("VE") present. Tr. at 46. On examination by the ALJ, Plaintiff testified that she was twenty-seven years old and lived with her parents and daughter. *Id.* at 50-51. Continuing, Plaintiff stated that she held a driver's license and was able to drive. *Id.* at 52. Plaintiff indicated that she dropped out of school in the eleventh grade, could read and write in simple English, and could perform simple arithmetic.[4] *Id.* When asked about her mental health issues, Plaintiff testified that she was on medications for depression and that she had ADHD. *Id.* at 56-57.

Next, the ALJ asked Plaintiff whether she could follow television programs. Tr. at 57. Plaintiff stated that she could sometimes follow programs, but there were also occasions on which she needed to re-watch episodes. *Id.* Continuing, Plaintiff stated that she received poor grades in school, namely grades of D or F. *Id.* Plaintiff testified that she knew how to use a computer, but did not own one, and that she had not used a computer in a long time. *Id.* at 58. Next, Plaintiff indicated that she had a phone with internet access and that she would use her phone to access the internet three times a day. *Id.* When asked about her activity on the internet,

---

[4]Plaintiff also provided testimony regarding her physical limitations. Tr. at 53-56. As stated above, Plaintiff does not take issue with the ALJ's treatment of her physical impairments and thus a lengthy recitation thereto is not provided in this Report and Recommendation.

Plaintiff stated that she did not use social media often and used her phone primarily to play games. *Id.*

Plaintiff then testified that she had problems with crowds and that she was overwhelmed with the number of people present for the hearing. Tr. at 58-59. Next, Plaintiff stated that she slept four hours a night, if she was "lucky." *Id.* at 60. Plaintiff testified that she was able to: shower, shave, wash her hair, and get dressed by herself; cook for her parents; perform housework such as keeping her room clean, dusting, sweeping, and vacuuming; shop; and rarely wash laundry, which was up a flight of stairs. *Id.* at 60-61. When asked how she spent a typical day, Plaintiff indicated that she and her daughter woke up around 7:00 A.M. or 8:00 A.M., and then she cooked breakfast for her daughter. *Id.* at 61. Continuing, Plaintiff stated that her daughter then played, which sometimes cause irritation for Plaintiff since the play was repetitive. *Id.* Plaintiff testified that she would then have lunch with her daughter, followed by some time for relaxation. *Id.* at 62. Next, Plaintiff indicated that she did not attend church or any clubs, and that she visited with relatives or friends "twice a month maybe." *Id.* Plaintiff then testified that she had the following hallucinations: she saw bugs crawling out of her couch; and while she was watching a movie with two friends she thought the blanket next to her was a person and attempted to stab him or her in the eye. *Id.* at 63-64. The ALJ then indicated that the doctor Plaintiff spoke to about the hallucinations stated that "[i]t is important to note [Plaintiff] stated she recently filed for disability," and asked Plaintiff if her disability filing had any relation to seeking emergency room treatment for hallucinations. *Id.* at 64. Plaintiff responded in the negative. *Id.*

Plaintiff was then examined by her attorney. Tr. at 64. When asked what had changed since Plaintiff had maintained employment, Plaintiff testified that her anxiety was "really bad" and described her stressors, namely, her parents, daughter, ex-husband, and being around others. *Id.* at 66-67. Plaintiff testified that she had good days and bad days, and that she became angry very easily. *Id.* at 67.

Following the examination of Plaintiff by her attorney, the ALJ examined the VE. *Id.* at 68. The ALJ posed to the VE a hypothetical individual of Plaintiff's age and with her education

and work background, who was limited to light exertional work with the following additional limitations: could not climb ladders, ropes, or scaffold, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could not be exposed to environmental hazards, including heights, machinery, and commercial driving; simple, routine tasks in a low-stress environment involving no fast-paced work, no strict production quotas, or frequent daily changes; and work requiring only superficial interpersonal interactions.  *Id.* at 70-71.  The VE testified that such an individual could not perform Plaintiff's past work, but that jobs existed in significant numbers in the national economy that such an individual could perform.  *Id.* at 71.  Specifically, the VE stated that the hypothetical individual could perform work as a cleaner/housekeeper; laundry worker; and tanning salon attendant.  *Id.* at 71-72.  Finally, the VE indicated that the testimony was consistent with the *Dictionary of Occupational Titles* and the *Selected Characteristics of Occupations*.  *Id.* at 72.

### III.    RELEVANT PORTIONS OF THE ALJ'S DECISION

After holding the hearing on August 5, 2015, the ALJ issued a decision on August 27, 2015.  Tr. at 25.  The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017.  *Id.* at 30.  Continuing, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 1, 2012, the alleged onset date.  *Id.*  The ALJ then determined that Plaintiff had the following severe impairments: obesity depression with anxiety; history of attention deficit hyperactivity disorder; lumbosacral strain; and right ankle sprain.  *Id.*  The ALJ then stated that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* at 31.

After consideration of the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a reduced range of light work with the following additional limitations: no climbing ladders, ropes or scaffolds; occasionally climbing ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; avoid exposure to hazards, such as heights, machinery, and commercial driving; simple, routine tasks in a low-stress environment

(meaning no fact pace, strict quotas, or frequent duty changes) that involves superficial interpersonal interactions. Tr. at 37.

After discussing Plaintiff's RFC, the ALJ indicated that Plaintiff was unable to perform any past relevant work. Tr. at 39. The ALJ then stated that Plaintiff was a younger individual on the alleged disability onset date, had a limited education, and was able to communicate in English. *Id.* at 40. Continuing, the ALJ found that the transferability of job skills was not material to the determination of disability because the Medical Vocational Rules supported a finding that Plaintiff was not disabled. *Id.* Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* Based on the above findings, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from September 1, 2012, through the date of the decision. *Id.* at 41.

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**V.      STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937(citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

-13-

## VI.    LAW AND ANALYSIS

### A.    Treating Physician Rule

Plaintiff first asserts that the ALJ failed to assign appropriate weight to the medical opinion of Plaintiff's treating psychiatrist, Dr. Hill.  ECF Dkt. #14 at 13.  An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If an ALJ decides to discount or reject a treating physician's opinion, he or she must provide "good reasons" for doing so.  Social Security Rule ("SSR") 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Id.*  If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 551 (6th Cir. 2010).  The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified

-14-

based upon the record." *Parks v. Social Sec. Admin.*, 413 Fed.Appx. 856, 864 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ).  However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence.  *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir. 2004).  Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion.  *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

Specifically, Plaintiff states that the ALJ acknowledged the treating relationship Plaintiff had with Dr. Hill, that Dr. Hill specialized in psychiatry, and, tangentially, that Plaintiff had a longitudinal treatment history with Dr. Hill, yet rejected the checklist medical opinion submitted by Dr. Hill.  Id. at 13-14.  Plaintiff claims that the ALJ's finding that Dr. Hill's treatment history did not indicate longitudinal signs and symptoms of any mental impairments except depression with acute anxiety and ADHD is erroneous.  *Id.* at 14.  Additionally, Plaintiff argues that the ALJ "rejected" the opinion of Dr. Hill, suggesting that the opinion was given no weight, but later indicates that the opinion was assigned less weight without explaining what "less" means.  *Id.* Continuing, Plaintiff avers that the ALJ did not assign controlling weight to Dr. Hill's opinion, but performed no formal analysis determining the consistency and supportability of the opinion. ECF Dkt. #14.  Plaintiff states that Dr. Hill's longitudinal treatment records show that she consistently sought psychiatric treatment from Dr Hill for approximately sixteen months, including treatment for: anxiety; rapid and pressured speech; feeling overwhelmed and angry; visual and auditory hallucinations; depression; and memory difficulties.  *Id.* (citing Tr. at 311, 364, 368, 375, 995, 1001).

Further, Plaintiff asserts that the ALJ failed to perform a portion of the analysis required by *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013), by failing to evaluate the following factors: (1) length of treating relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; and (5) the specialization of the treating source.  ECF Dkt.

#14 at 16 (citing 20 C.F.R. § 404.1527).  Plaintiff states that the only evidence to contradict Dr. Hill's opinion is the opinions from the state agency physicians, to which the ALJ assigned little weight.  *Id.*

Defendant contends that the ALJ properly evaluated the mental opinion evidence.  ECF Dkt. #16 at 15.  Continuing, Defendant asserts that Dr. Hill provided his medical source statement in a checklist format with essentially no explanation of the limitations that were assessed, and only including a brief listing of the diagnoses of schizoaffective disorder and borderline personality disorder with associated symptoms.  *Id.*  Defendant argues that Dr. Hill's opinion is at odds with his own treatment notes as neither the notes nor the records of other clinicians supported active diagnoses of schizophrenia or borderline personality disorder at the time of Dr. Hill's 2015 assessment.  *Id.* at 15-16.  Further, Defendant states that the Sixth Circuit has recognized that an ALJ may discount a checklist form from a treating doctor that contains no rationale, particularly when it is inconsistent with the treatment records.  *Id*. at 16 (citing *Curler v. Comm'r of Soc. Sec.*, 561 Fed. Appx. 464, 471-72 (6th Cir. 2014)).

Next, Defendant avers that the lengthy treatment records between Plaintiff's alleged disability onset date in September 2012 and the ALJ's decision in August 2015 show that, with two limited exceptions, she consistently denied hallucinations, paranoia, and other symptoms of psychosis or schizophrenia.  ECF Dkt. #16 at 16 (citing Tr. at 287, 293, 299, 312, 317, 324, 329, 336, 341, 348, 361, 375, 377, 382, 489, 500, 792, 918, 923, 926, 956, 962, 981, 991, 1006).  Defendant then indicates that despite Plaintiff's statement that she had been diagnosed with schizoaffective and bipolar disorders as a teenage, Dr. Hill determined by Plaintiff's second visit that ADHD was much more likely to cause her symptoms.  *Id.* (citing Tr. at 387, 382).  Continuing, Defendant notes that Plaintiff reported an improvement in her ability to focus and feeling calmer after she was prescribed an ADHD medication.  *Id.* (citing Tr. at 374).

Moving to the first reported hallucination since her alleged onset date, Defendant states that Plaintiff reported that she saw bugs coming out of her couch the same week that she filed for disability benefits, after reporting no prior hallucinations or paranoia since high school.  ECF Dkt. #16 at 16.  Defendant indicates that Dr. Hill continued to diagnose and treat Plaintiff for

ADHD and insomnia after the alleged visual hallucination, and did not diagnose any psychotic condition or prescribe any anti-psychotic medication. *Id.* (citing Tr. at 365). Continuing, Defendant notes that Plaintiff reported to Dr. Hill that she had "vastly improved" three months after reporting the hallucination. *Id.* Defendant then states that Plaintiff did not return to Dr. Hill until eight months later, in November 2014, when she reported what Dr. Hill described as "limited hallucinations." *Id.* at 17. Regarding the limited hallucinations, Defendant avers that Dr. Hill indicated that the release of her ex-husband from jail and his abusive behavior had impacted her mood and likely led to some mild psychotic symptoms. *Id.* Defendant indicates that Dr. Hill recommended psychotherapy and suggested that Plaintiff "involve herself with something to improve her self-esteem such as getting her GED or a part-time job." *Id.* (citing Tr. at 1002).

Next, Defendant states that three days after the meeting with Dr. Hill described immediately above, Plaintiff went to the emergency room where she frequently sought unwarranted care, as noted by the ALJ and Plaintiff's primary care physician. ECF Dkt. #16 at 17 (citing Tr. at 31, 929, 942). Defendant asserts that the details of the hallucination offered after hospitalization differed than those reported to Dr. Hill, and that Plaintiff was released after two days of hospitalization, during which she engaged appropriately with peers and hospital staff and showed no symptoms of psychosis. *Id.* at 17-18 (citing Tr. at 962-63). Continuing, Defendant indicates that Plaintiff did not report any hallucinations, paranoia, or other psychotic features after her release for the remainder of the relevant period. *Id.* at 18 (citing Tr. at 985, 988, 994, 999). Defendant states that in February 2015, Plaintiff told Dr. Hill that she was "doing very well" since her discharge from the hospital, despite evidence showing that she attended only two therapy sessions, missed a scheduled psychiatric appointment, and had run out of her medications. *Id.* (citing Tr. at 988, 994-95, 998-1000). Additionally, Defendant notes that Dr. Hill informed Plaintiff that he would no longer treat her if she continued to fail to make arrangements for psychotherapy, as repeatedly recommended. *Id.* (citing Tr. at 985-86).

Further, Defendant avers that the ALJ applied the factors of 20 C.F.R. § 404.1527, namely: (1) length of treating relationship and frequency of examination; (2) the nature and

-17-

extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; and (5) the specialization of the treating source.  ECF Dkt. #16 at 20.  Defendant also asserts that Plaintiff's suggestion that a conflicting opinion is necessary to discount a treating physician's opinion finds no support in Sixth Circuit law or the applicable regulations.  *Id.*

Plaintiff's arguments are without merit.  Dr. Hill's opinion consisted of a checklist with no explanation for the findings contained therein beyond listing a diagnosis of "schizoaffective disorder + bipolar personality disorder, hallucinations, self injurious behavior, chaotic relationships." [sic] Tr. at 940-41.  The ALJ discussed Dr. Hill's opinion, stating:

> [T]he undersigned has rejected [Dr. Hill's] "checklist" medical opinion, which includes schizoaffective disorder and borderline personality traits among [Plaintiff's] active diagnoses.  Specifically, the undersigned does not give Dr. Hill's opinion controlling weight because his longitudinal treatment history with [Plaintiff] does not indicate any longitudinal signs and symptoms of any mental impairments except for depression with acute exacerbations of anxiety related to raising her daughter and issues with her ex-husband and history of attention-deficit hyperactivity disorder since 2013.  Moreover, on March 31, 2015, Dr. Hill noted that [Plaintiff] reported to have "increased anxiety over possible pregnancy" after she reestablished contact with her ex-husband, whom she had previously characterized as "manipulative and "abusive" and labeled a "con artist."
>
> As discussed, the undersigned gives less weight to Dr. Hill's check-list opinion because it is inconsistent with his treatment history with [Plaintiff] since 2013.

Tr. at 34, 39. (internal citations omitted).

The Sixth Circuit has explained that a checklist opinion from a treating doctor that contains no rational for the opinion may be discounted, especially when the opinion is inconsistent with the treatment records.  *Curler*, 561 Fed. Appx. at 471-72.  In the instant case, Dr. Hill submitted a checklist opinion that is not supported by his treatment records.  Throughout the vast majority of her treatment with Dr. Hill, each treatment session with two exceptions, Plaintiff consistently denied hallucinations, paranoia, and other symptoms of psychosis or schizophrenia.  Tr. at 287, 293, 299, 312, 317, 324, 329, 336, 341, 348, 361, 375, 377, 382, 489, 500, 792, 918, 923, 926, 956, 962, 981, 991, 1006.  While Plaintiff did report hallucinating that bugs were coming out of her couch, a report made just days before she filed her disability claim, Plaintiff routinely denied visual or auditory hallucinations to Dr. Hill during treatment.  *See id.* at

-18-

364.  Additionally, when Plaintiff told Dr. Hill that she saw snow moving like sand, a car distorting itself, and a "monster like thing," and reported seeing and talking to "people" on one occasion, Dr. Hill stated that "[o]therwise [Plaintiff] has no misperceptions or hallucinations.  It is noted that she has been sleeping very poorly for several mites [sic] now and is quite exhausted."  *Id.* at 1001.  Further, Dr. Hill noted that stress from the release of Plaintiff's ex-husband from prison worsened her mood and likely led to some mild psychotic symptoms.  *Id.* at 1002.

The ALJ indicated that Dr. Hill's checklist opinion was not assigned controlling weight because the mental impairments contained in the diagnosis section of the checklist were not supported by the treatment records.  *See* Tr. at 34. This analysis is supported by the record. While Plaintiff repeatedly reported anxiety and depression to Dr. Hill, she denied visual or auditory hallucinations on nearly every visit.  Additionally, while Plaintiff did report several instances of mild hallucinations on two occasions over the course of her treatment with Dr. Hill, the opinion submitted by Dr. Hill does nothing to explain how these hallucinations gave rise to the limitations contained therein, especially considering Plaintiff's otherwise consistent denial of symptoms associated with schizoaffective disorder, including hallucinations.

Plaintiff's argument that the ALJ failed to apply the factors of 20 C.F.R. § 404.1527 also fails.[5]  The ALJ considered the length of the treating relationship and frequency of examinations, as evidenced by his discussion of the treatment Plaintiff received from Dr. Hill.  *See* Tr. at 34. For this same reason, the ALJ considered the nature and extent of the treatment relationship.  *See id.*  The supportability and consistency of Dr. Hill's decision was discussed by the ALJ when the reasons for discounting the opinion were provided, as discussed above.  *See id.*  Finally, the ALJ clearly indicated that Dr. Hill was Plaintiff's "treating psychiatrist" and was aware of Dr. Hill's specialization.  *See id.*  Likewise, Plaintiff's assertion that the ALJ was required to cite a conflicting opinion when discounting Dr. Hill's opinion fails because it has no basis in Sixth

---

[5]The factors of 20 C.F.R. § 404.1527 are: (1) length of treating relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion of with the record as a whole; and (5) the specialization of the treating source.

Circuit law or the applicable regulations. Accordingly, Plaintiff has failed to show that the ALJ violated the treating physician rule.

### B. Substantial Evidence

Plaintiff also asserts that the ALJ's evaluation at step three and step five of the sequential evaluation is not supported by good reasons or substantial evidence. Specifically, Plaintiff claims that the ALJ erred by: failing to perform and analysis of Listing 12.03, and the paragraph A criteria of Listings 12.04 and 12.06; and performing an analysis of the paragraph B criteria of Listing 12.04 and 12.06 that is not supported by substantial evidence. ECF Dkt. #14 at 18. Plaintiff claims that it is unclear from the ALJ's decision whether she met the paragraph A criteria of Listing 12.04 or 12.06, and that Plaintiff experienced auditory and visual hallucinations and thus should have been evaluated under Listing 12.03. *Id.* Continuing, Plaintiff asserts that the ALJ failed to provide good reasons, supported by substantial evidence, supporting the findings regarding the paragraph B criteria of Listings 12.04 and 12.06. *Id.*

Defendant contends that the ALJ did not evaluate Listing 12.03 as it was found that the evidence as a whole did not support finding a severe impairment of schizoaffective disorder, borderline personality disorder, or any other psychotic disorder, and thus the ALJ would not have found that Plaintiff's impairments met or medically equaled Listing 12.03. ECF Dkt. #16 at 21-22. Next, Defendant states that the ALJ did indicated that Plaintiff met the paragraph A criteria of Listings 12.04 and 12.06, as well as 12.02, despite Plaintiff's assertion that the ALJ's findings were "unclear."[6] *Id.* at 22. Continuing, the Defendant indicates that the ALJ found that the paragraph B criteria of these listings were not met, and thus Plaintiff did not meet the Listings, which require a claimant meet all requirements of the paragraph A and paragraph B criteria, or, alternatively, the paragraph C criteria. *Id.* Defendant asserts that the ALJ explained why Plaintiff did not meet the paragraph B criteria of each listing. *Id.*

Plaintiff's arguments are without merit. The Sixth Circuit has explained that an ALJ is not required to address every listing or the listings that the claimant clearly does not meet.

---

[6]Plaintiff does not take issue with the ALJ's treatment of Listing 12.02. *See* ECF Dkt. #14 at 17-20.

-20-

*Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. Appx. 426, 432 (6th Cir. 2014) (internal citations omitted). Further, a claimant is required do more than point to evidence on which the ALJ could have considered a listing, and, accordingly, must point to specific evidence that demonstrates she reasonably could meet or equal every requirement of the listing. *Id.* Regarding Listing 12.03, Plaintiff makes no attempt to explain how she could meet every requirement of the listing, instead stating only that she "was diagnosed with Schizoaffective disorder and had symptoms of both auditory and visual hallucinations." *See* ECF Dkt. #14 at 17. Accordingly, Plaintiff has failed to meet her burden of explaining how she could meet the requirements of Listing 12.03.

The paragraph B criteria of Listing 12.04 and 12.06 require an extreme limitation of one, or marked limitations of two, of the following areas of mental functioning (12.00F): (1) understand, remember, or apply information (12.00E1); (2) interact with others (12.00E2); (3) concentrate, persist, or maintain pace (12.00E3); or (4) adapt or manage onself (12.00E4). *See* Listings 12.00, 12.04, 12.06. As for the paragraph B criteria of Listing 12. 04 and 12.06, Plaintiff cites to evidence she believes shows that the ALJ did not rely on substantial evidence when making the paragraph B findings regarding Listings 12.04 and 12.06. ECF Dkt. #14 at 19-20.

When determining that Plaintiff did not meet the paragraph B criteria of Listings 12.04 and 12.06, the ALJ considered Plaintiff's activities of daily living, including: caring for her daughter and ailing parents; cleaning the house; performing personal care; dressing appropriately for the weather; attending medical appointments; working on finding a job; and implementing dietary changes and exercise routines in an effort to lose weight. Tr. at 34-35. The ALJ also looked to Plaintiff's social functioning, which included the following: maintaining primary responsibility over the welfare of her toddler; caring for her ailing parent with whom she and her daughter live; the re-establishment of a relationship with her ex-husband following his release from prison despite repeatedly telling her doctors that her anxieties and psychological exacerbations stemmed from him; maintaining normal, healthy support mechanisms through her

parents and cousin; staying with her cousin for a short vacation over a holiday; and temporarily living with a friend after engaging in an argument with her father.  Tr. at 35.

Regarding concentration, persistence, or pace, the ALJ indicated that Plaintiff: had an adequate ability to maintain attention and concentration, normal though content, logical and goal-directed thought processes, and intact judgment and insight; and that despite her mental impairments, she acted as the primary caregiver for her daughter and ailing parents.  *Id.* at 35-36. Additionally, the ALJ noted that Plaintiff had not experienced any episodes of decompensation, of extended duration.  *Id.* at 36.  For these reasons, the ALJ found that Plaintiff did not meet the paragraph B criteria of Listings 12.04 and 12.06.  *Id.*  Despite Plaintiff's assertion to the contrary, the ALJ's evaluation of the paragraph B criteria of Listings 12.04 and 12.06 is supported by a thorough discussion and substantial evidence.  Accordingly, the ALJ's decision is supported by substantial evidence.

## VII.  CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.


Date: January 11, 2018                    */s/George J. Limbert*
                                          GEORGE J. LIMBERT
                                          UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).